IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


DEMETRIUS HILL,

       Plaintiff,

   v.                                   Civil Action No. 3:06cv136
                                            (Judge Groh)


WARDEN AL HAYNES, ET AL.,

       Defendants.

OPINION/REPORT AND RECOMMENDATION

I. Background/Procedural History

On December 15, 2006, the *pro se* plaintiff initiated this action by filing a *Bivens* civil rights complaint against the above-named defendants. On January 11, 2007, the undersigned conducted a preliminary review of the file and determined that the complaint could not be summarily dismissed at that time. Therefore, the Clerk was directed to issue summonses for the defendants and forward the case to the United States Marshal Service for service of process. The docket reflects that service of process was effected on January 19, 2007.

After the undersigned granted a filing extension on April 2, 2007, the defendants filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment. On April 3, 2007, the undersigned issued a notice pursuant to *Roseboro v. Garrison,* 528 F.2d 309, 310 (4th Cir. 1975), in which the plaintiff was advised of his right to respond to the defendants' dispositive motion and of the consequences of failing to respond to the defendants' motion. The plaintiff filed a response

1

in opposition to the defendants' motion on May 18, 2007.

Subsequently, on November 29, 2007,   the undersigned issued a Report and Recommendation that denied the defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment because there remained "an issue of material fact as to whether or not the defendants played a part in the plaintiff's failure to exhaust, and thus, the undersigned f[ound] that it would be inappropriate to grant summary dismissal of the plaintiff's claims for the failure to exhaust based on the . . . record." [DE 45].

On December 10, 2007, the defendants filed objections to the Report and Recommendation. [DE 47].  Therein, the defendants contend that the Report and Recommendation is based on four basic assertions: (1) plaintiff provided an affidavit that he filed grievances but the grievances are not appearing in Bureau of Prisons [BOP] records; therefore, BOP staff have prevented his ability to exhaust the administrative remedy process; (2) the defendants have not verified the accuracy of their reports nor filed any affidavit from any staff member to contradict plaintiff's assertions; (3) the fact the plaintiff has filed 163 administrative remedies but only exhausted seven is irrelevant to his not exhausting his administrative remedies pertaining to the issues raised in his complaint; and (4) defendants did not address plaintiff's claim that staff did not provide him with administrative remedy forms.  The defendants attached a declaration from the Regional Administrative Remedy Clerk in support of the accuracy of BOP records.  Further, defendants argued that the plaintiff's assertions that (1) he filed administrative remedies that were never entered into the system or were destroyed and (2) he could not exhaust because staff would not provide him with the correct administrative remedy forms were clearly contradictory.  Despite this contradiction, the defendants maintained the plaintiff was provided with forms whenever he requested them and when he submitted such forms,

2

the forms were processed by the institution's administrative remedy clerk.  The defendants relied on actual responses by BOP staff to Hill's numerous administrative grievances as evidence that plaintiff had access to the administrative remedy program; however, this is not conclusive evidence as to warrant summary judgment.

Following these objections, on December 10, 2007, the District Court [Bailey, J.] entered an Order declining to adopt the undersigned's Report and Recommendation after considering the defendant's objections and the attached supplemental declarations.  The court determined there was no issue of material fact as to "whether or not the defendants played a part in the plaintiff's failure to exhaust." [DE 51].  Accordingly, the court ordered that the defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment be granted, and the plaintiff's claims be dismissed without prejudice.

Plaintiff Hill appealed the District Court's order to the Fourth Circuit Court of Appeals.  In a *per curiam* opinion filed on June 2, 2010, the court found plaintiff had shown genuine issues of material fact as to whether the defendants hindered his ability to exhaust administrative remedies.  Therefore, the Fourth Circuit concluded that the district court erred in granting summary judgment on this issue.  Consequently, the case was "remand[ed] for a determination whether the grievance procedure was 'available' to Hill within the meaning of [42 U.S.C.] § 1997e(a) so he could administratively exhaust his claim." [DE 67].

Pursuant to 28 U.S.C. § 636, this matter was referred by the District Court to the undersigned on August 16, 2010. [DE 70].  On August 20, 2010, the undersigned directed the defendants to file a response in regard to "whether the grievance procedure was 'available' to [the plaintiff] within the meaning of § 1997e(a) so that he could administratively exhaust his claim." [DE 71 (quoting DE 67

at 15)].  On September 9, 2010, the defendants filed a motion requesting an extension to file the response regarding the availability of grievance procedures until October 1, 2010. [DE 74].  The undersigned granted the defendants' extension request, by Order, on September 13, 2010. [DE 75]. On October 1, 2010, the defendants filed their response addressing the availability of grievance procedures in accord with DE 71. [DE 77].  The defendants contended that the grievance system was available to the plaintiff, and the plaintiff was never denied access to the administrative grievance process. [DE 77].

On March 17, 2011, the undersigned ordered a hearing set for June 17, 2011, in Clarksburg, WV. [DE 81].  The undersigned directed the scope of this hearing to be limited to whether the grievance process was available to the plaintiff. [DE 81].  After setting the hearing date, the undersigned appointed Mr. Darrell W. Ringer to act as plaintiff's counsel at the scheduled evidentiary hearing. [DE 82].

On May 9, 2011, plaintiff moved for a telephonic discovery hearing to be conducted. [DE 87].  On May 12, 2011, the undersigned ordered that such telephonic discovery hearing be conducted on May 20, 2011. [DE 90].  On May 18, 2011, defendants' counsel moved to have the telephonic discovery hearing continued due to a family scheduling conflict, and plaintiff's counsel did not object to rescheduling the telephonic discovery hearing. [DE 93].  On May 19, 2011, the undersigned ordered the telephonic discovery hearing continued and requested that counsel agree upon a mutually acceptable time to conduct the hearing. [DE 94].

On June 7, 2011, plaintiff's counsel moved for a forty day continuance of the June 17, 2011 hearing.  [DE 96].  The defendants' submitted a response to the plaintiff's motion agreeing to continue for forty days. [DE 97].  On June 13, 2011, the undersigned filed an order setting the

4

evidentiary hearing for July 27, 2011. [DE 99].

On July 7, 2011, the parties jointly filed a motion to continue so they could complete additional discovery before the evidentiary hearing. [DE 103]. Subsequently, the undersigned continued the evidentiary hearing until August 24, 2011. [DE 106].

On August 18, 2011, plaintiff's counsel filed a motion to continue the evidentiary hearing due to discovery issues. [DE 109]. On August 25, 2011, the undersigned issued an order to continue the evidentiary hearing indefinitely and authorized the United States Marshal Service to transport the plaintiff to the Western District of Virginia so the plaintiff could attend an unrelated trial during October 2011. [DE 112].

On October 27, 2011, the undersigned ordered the plaintiff be transferred to an appropriate facility until the resolution of the evidentiary hearing scheduled for December 7, 2011. [DE 114]. On November 16, 2011, plaintiff's counsel submitted a motion to continue the evidentiary hearing for six weeks due to discovery issues stemming from plaintiff's recent transport from his unrelated trial. [DE 117]. On November 17, 2011, the undersigned denied the motion for continuance holding sufficient time had been granted for parties to conduct relevant discovery. [DE 121].

On December 5, 2011, plaintiff's counsel filed another motion for the continuance of the December 7, 2011 hearing. Plaintiff's counsel indicated that without a continuance, the plaintiff would lack necessary information to support his case. [DE 123]. Subsequently, the undersigned granted the motion to continue; however, the undersigned ordered plaintiff's counsel to appear telephonically on December 7, 2011 to schedule the evidentiary hearing. [DE 124]. On December 7, 2011, the evidentiary hearing was rescheduled for January 19, 2012. [DE 126]. On January 17, 2012, the defendants' counsel submitted a motion to continue the January 19 evidentiary hearing

5

until January 20 due to a personal commitment. [DE 129].  Subsequently, the undersigned granted

the motion to continue and the evidentiary hearing was scheduled for January 20, 2012. [DE 130].

An evidentiary hearing was conducted and spanned three days: January 20, 2012; February

10, 2012; and February 15, 2012. [DE 134, 148, and 155]  On February 10, 2012, at the second day

of the evidentiary hearing, Hill relieved Mr. Ringer as counsel and manifested his intent to proceed

*pro se* in this matter.  The court granted Mr. Hill's request to represent himself, and Mr. Ringer was

allowed to withdraw from the case. [Tr. Vol. 2, p,7-17][DE 148].  On April 2, 2012, the case was

reassigned to the United States District Judge [Groh, J.]. [DE 164].

## II. Claims

### Plaintiff:

**A.     Claim 1 of Instant Action[1]**

Hill's first claim of the instant civil action involves three sub-claims.

**Sub-claim 1-1**

Hill alleges he was assigned to the SHU without having an incident report despite being

cleared for the general population at the time of his arrival at Hazelton on September 12, 2006.  Hill

contends Counselor Etris told him he was being designated to the SHU because Hill "liked to file

---

[1]The undersigned makes no recommendation concerning the substantive merits of any of Hill's claims or sub-claims.  The claims and sub-claims are identified herein solely to provide some context for the reviewing District Judge and other courts and for identification with respect to exhaustion.  The sole issues addressed in this opinion are: a) during the relevant time period, was there an informal and administrative remedy process available for use by inmates at USP Hazelton; b) Did Hill exhaust such administrative remedies with respect to each claim and sub-claim filed as a part of this civil action; c) Did the Warden and or staff at USP Hazelton prevent Hill from exhausting administrative remedies for any of the claims or sub-claims made in this action; d) Is Hill excused from exhaustion of administrative remedies with respect to any claims or sub-claims made in this action.

[law]suits[.]" [DE 1].

**Sub-claim 1-2**

Hill was held in the SHU from September 12, 2006 until September 15, 2006. [DE 143-32]. On September 15, 2006 Hill was assigned to Unit C2. [DE 143-32].

Hill alleges and testified that upon arriving in the SHU on the afternoon of September 12 he was housed in a multipurpose room with another prisoner until September 15 due to a shortage of available cells [Tr. Vol 2, p. 125]. Hill contends that he was housed in the multipurpose room, and the conditions in the multipurpose room were inadequate. [DE 1][Tr. Vol. 1, p. 14-15].

Hill makes these allegations concerning living conditions in the SHU multipurpose room in a separate subclaim of his complaint. However, his testimony and BOP records indicate that he filed claims 1-1 and 1-2 as one grievance on September 15, 2006. *See* BP9 numbered 427215-F1. This multi-claim grievance was described above in the subclaim 1-1 section.

**Sub-claim 1-3**

Hill alleges and testified he was improperly assigned a top bunk upon being transferred to Unit C2 from the SHU on September 15, 2006.

**B.    Claim 2 of Instant Action**

The second claim of the instant civil action involves two sub-claims.

**Sub-claim 2-1**

Hill alleges and testified Correctional Officer [C.O.] Morgan acted improperly by reading Hill's legal mail, using racial slurs, and confiscating Hill's copy of *Blood in my Eyes* by George Jackson. [DE 1][Tr. Vol. 1, p.  27].

**Sub-claim 2-2**

Hill contends and testified he immediately went to speak to Lt. Clements[2] about his problems with C.O. Morgan and Clements retaliated against him by sending him to the SHU for complaining about Morgan. [Tr. Vol. 1, p. 29].

## C.    Claim 3 of Instant Action

The third claim of the instant action involves ten sub-claims.

### Sub-claim 3-1

Hill alleges he was placed in a two-man cell with three other inmates upon arriving at the SHU on September 21, 2006. He further alleges the conditions were inadequate and, *inter alia*, he was forced to sleep on the floor due to a lack of beds in the cell. Hill claims he stayed in these conditions for about a week. [DE 1][Tr. Vol. 1, p. 44].

### Sub-claim 3-2

Hill contends he was placed in the multipurpose room again after returning to Hazelton on November 28, 2006 and found himself living in the same conditions that he experienced upon his initial arrival at Hazelton. *See* Subclaim 1-2. [DE 1]

### Sub-claim 3-3

Hill maintains he attempted to file BP8s against C.O. Spotlan and Lt. Gifford for placing Hill in overcrowded cells and confiscating Hill's personal property and mail

### Sub-claim 3-4

Hill alleges prison mail room staff refused to mark his incoming legal mail appropriately and withheld his legal mail at various times when he was in the SHU and when he was out of Hazelton for court from October 17, 2006 until November 28, 2006. [Tr. Vol. 1, p. 79][Tr. Vol. 2, p. 146].

---

[2]Clements is also spelled "Clemmons" in some places in the transcript.

*Also see* [DE 143-32]. Further, he accuses C.O. Morgan of reading his legal mail and informing other correctional officers of Hill's impending legal actions against correctional officers. Hill argues that this left him vulnerable to staff retaliation. [DE 1].

**Sub-claim 3-5**

Although Hill does not allege a date for the incident, Hill alleges C.O. Spotlan threatened to kill Hill if he continued to file requests for administrative remedies. Hill accuses Spotlan of attempting to have other prisoners attack him and accuses Spotlan of referring to Hill as a "snitch" in front of other inmates. [DE 1]. *Also see* [Tr. Vol. 1, p. 86][Tr. Vol. 2, p.93]. [DE 148]. During the second day of the evidentiary hearing, Hill indicated he filed a BP8 on the issue and wrote a letter to Warden Driver; however, he never completed the subsequent grievances concerning this incident. [*Id*].

**Sub-claim 3-6**

Hill alleges that after he returned from court on November 28, 2006, he was denied access to paper, pens, personal hygiene items, and reading materials due to his persistence to file administrative grievances.

**Sub-claim 3-7**

Hill claims Marrero[3] interfered with one of Hill's civil trials by denying him legal calls except on one occasion during the relevant period of his incarceration at Hazelton. [DE 1]. Hill alleges he filed a BP8 with Counselor Marrero and wrote a letter to the warden. [Tr. Vol. 1, p. 62]. Hill contends he received no response to this BP8. [Tr. Vol. 1, p. 63]. Hill filed a BP9, 438922-F1, at some point in December 2006 which was rejected on January 9, 2007. [*Id*].

---

[3]Marrero is also spelled "Morrero" within the transcript.

**Sub-claim 3-8**

Hill alleges his SHU cell was unheated and contained  ice.

Hill alleges that he filed a BP8 and never received a response.  [Tr. Vol. 1, p. 92].  However, Hill alleges the issue was resolved after he complained to a prison visitor from the Regional Director's office.   Subsequently, his cell was heated, and he did not pursue a BP9 or BP10 on this issue.  [Tr. Vol. 1, p. 92-93].

**Sub-claim 3-9**

 Hill accuses Lt. Trait and C.O. Spotlan of "double-celling" incompatible inmates.  Although he does not allege a date for these actions, Hill implies that this incident occurred at some point after he returned from court on November 28, 2006 and before he filed the complaint on December 15, 2006.  Further, Hill asserts the SHU contains a plexiglass barrier which prevents staff from hearing inmates who are in distress and need staff assistance.  Hill contends that this plexiglass barrier has resulted in staff not responding to sexual assaults, non-sexual assaults, and medical emergencies. [Tr. Vol. 1, p. 93-96].

Hill asserts he filed a BP8 on these issues with Counselor Johnson and wrote letters to the warden and Regional Director in December 2006.  [Tr. Vol. 1, p. 95, 102, 105].  Hill maintains he filed a BP9 which was rejected because there was no BP8 attached to the BP9. [*Id*].  Hill alleges he filed a BP10 which was also rejected because Hill failed to provide his grievance history for this issue. [*Id*].  Hill admitted that he does not "believe [he] got the duress buttons all the way to the [BP]11."  [Tr. Vol. 1, p. 96].  It is also significant that Hill acknowledges that the BP9 was not responded to until late December or filed until January 24, 2007.  [Tr. Vol. 1, p. 106].

**Sub-claim 3-10**

10

Hill asserts on December 13, 2006, Lt. Trait offered "extra trays" of food to the first inmate to stab Hill.  Hill maintains Lt. Trait made this offer in response to Hill's complaints concerning SHU conditions. [DE 1].

### III. Contentions of Parties

A.     **Plaintiff Hill's Contentions**

**Prevention of Exhaustion**

Hill contends prison staff actions and prison policies prevented him from exhausting administrative remedies in the following ways:

1)      failure to provide him with the necessary forms;

2)      failure to timely process the forms he filed;

3)      failing to give him responses or copies of responses to claims he filed;

4)      using Hill's failure to attach a copy of a rejected BP8 or 9 as a basis for rejecting a filed BP 9, 10 or 11; and

5)      threatening him with retaliation for filing claims.

Therefore, he contends he had no obligation to continue the appeals process after not receiving a response to his grievances.  Essentially, Hill argues the entire administrative remedy process was not available to him; therefore, he asserts his claims survive despite not being properly exhausted.

B.     **The Defendants' Contentions**

The prison officials (Government) contend:

1)      that Hill's claims are not supported in prison records;

2)      that Hill's failure to file claims beyond the BP9 level constitute grounds for the

dismissal of the claims; and

3)      that because Hill has historically filed multiple claims and only exhausted a fraction of the grievances he filed, the court should conclude that Hill failed to exhaust the claims now at issue in this case.

### IV.   Relevant Record Evidence

Plaintiff Hill arrived at USP Hazelton on September 12, 2006 and remained there until October 17, 2006 ("first assignment").   [Tr. Vol. 1, p. 7 and Gov. Exhibit 1, Declaration of K. Littlejohn].  On October 17, 2006, Hill was released from USP Hazelton on federal writ to the custody of the United States Marshals Service in order for Hill to attend an unrelated trial. [Gov. Exhibit 1, Declaration of K. Littlejohn].  Following his court appearance, Hill returned to USP Hazelton on November 28, 2006 ("second assignment"). [*Id*].  Hill filed the instant action on December 15, 2006. [DE 1].  Hill remained at Hazelton until April 24, 2007 when he was transported to Oklahoma City in route to USP Terra Haute, Indiana. [DE 143-32].

Between September 2006 and December 2006 USP Hazelton had an informal administrative remedy process and a formal administrative remedy process which were available to inmates.  The informal process was known as the BP8 process.  The formal process started with BP9 and extended to BP10 and BP11. [Tr. Vol. 3, p. 80].

With respect to the informal resolution process, the evidence clearly shows it was carried out by some prison staff in accord with the strict rules of the written policy and by other prison staff in an *ad hoc* manner.

According to the testimony, the BP8 informal process was started when an inmate with a complaint obtained a form from a member of staff, filled it out and gave it to staff for distribution

to someone on staff who was responsible for handling the type of complaint being made.  Under

Warden Haynes, there was a written policy for administering and tracking BP8's.  The policy

outlined in the October 25, 2004 Administrative Supplement [Plaintiff's Ex. 31 and 32] called for:

> Inmates must request an Informal Resolution Form (Attachment A) from their assigned Counselor to address a complaint [.]; Counselors are obligated to make a good-faith effort to resolve All inmate concerns prior to any forms being issued[.]; An inmate must submit a separate form for each issue[.]; Ordinarily, staff should respond to an inmate's informal resolution request within five (5) working days[.]; The Counselor will hand-deliver the Informal Resolution form (no later than the close of the following business day) to the identified respondent[.]; The Counselor will document to whom (staff) the form was issued, date issued, and date returned .... in the Counselor's Administrative Log Book[.]; ...the responding department will hand-deliver the completed Informal Resolution to the appropriate Counselor[.]; The Counselor will then meet with the inmate to close out the Informal Resolution process in a timely manner[.]; If after five (5) working days the Counselor and inmate are unsuccessful in their attempts at informal resolution, ..., ordinarily the Correctional Counselor will issue the inmate an Administrative Remedy Form BP-229[.]; Each Administrative Remedy Form issued by the Counselor will be logged in the Log Book on the date of issuance[.]; Informal resolutions are not required on appeals of a DHO disciplinary action[.]; ...UDC appeals do not require an informal resolution[.] The Unit Correctional Counselor will check Sentry daily.  All receipts will be printed and routed daily to the inmate.

The Haynes policy was rescinded by Warden Driver on his arrival at the end of October.

Warden Driver's policy dated November 29, 2006 [Defendant Ex. 14] did not require counselors to

keep a tracking log and opened the availability of forms for BP8s and BP9s to others than the

inmate's unit team members and unit staff.  Tr. Vol. 3, p. 112-116].

Tammy Titchenell, Administrative Remedy Clerk[4] at USP Hazelton  testified .  She was the

---

[4]February 17, 2012 Defendants filed their motion to supplement the record with the declarations of Tammy Titchenell and Susie Elza [DE 147].  The motion to supplement was granted by order dated February 23, 2012 [DE150].  Thereafter, Hill filed objections to the supplementation [DE 162] and requested a hearing [DE 163].  The Court denied the request for a hearing and objections by order dated April 3, 2012 [DE 165].  According to the Declaration of Tammy R. Titchenell, she erroneously testified she was the Administrative Remedies Clerk between September and December 2006.  Instead, she avers she was the Associate Warden's

administrative remedy clerk at USP Hazelton from September 2006 to December 2006. [Tr. Vol. 3, p. 5]. As such she processed the administrative remedies provided to her by the counselors which results in a number being automatically assigned to each claim. [*Id.*]. She had the discretion to accept or reject a BP9 based on compliance or non-compliance with BP8 practice. She had discretion to accept a BP9 even without a BP8 attached. She could also ask for more information before exercising her discretion. [Tr. Vol. 3, P. 79-80, 81]. Titchenell testified she did not loose any administrative remedies submitted to her. [Tr. Vol. 3, p. 7]. The process in place during September to December 2006 was for the blue BP9 form to be copied, the original put in a file and held for 5 years. At some point starting in 2007 she started scanning the responses. [*Id.*]. It [scanning] really got started in the BOP in 2008. By that time they also started scanning some of the BP9s. [Tr. Vol. 3, p. 8].

Titchenell further testified that once the BP9 arrived on her desk, it was assigned by her to someone for a response. Once the response was signed off by the Warden, the response was entered in the computer and a packet was put together. For inmates in the SHU, the packet was placed into the distribution center in the Warden's office for the SHU counselor to pick up and distribute to the inmate as appropriate. She acknowledged the process used was not what was required under Warden Haynes institutional policy - that the BP9 responses be returned to the inmate via institutional mail.

Secretary during the relevant time period and did not become the Warden's Secretary and Administrative Remedies Clerk until February 18, 2007. She also averred that the remainder of her testimony was correct in that she had collateral duty responsibility as Administrative Remedy Clerk when she filled in for the Warden's Secretary during the relevant time period. Susie Elza avers she was the Warden's Secretary during the relevant time period and as such was the Administrative Remedies Clerk; she has no independent recollection of Hill or any administrative remedies he may have filed during he relevant time period and if Hill filed any such administrative remedies [BP9] the warden's written response would appear in the Sentry System.

14

[Tr. Vol. 3, p. 16-23, 34].  Titchenell testified Hill filed four (4) BP9s between September and December 2006.  Tr. Vol. 3, p. 18].  Titchenell testified Inmates are not denied the opportunity to file a BP9 by rejection,  denial, or lack of response to their BP8. [Tr. Vol. 3, p. 92-93].

She also testified that with respect to BP8s, the process followed in September to December 2006 was: the BP8 form was given to a counselor or other member of staff; the counselor determined the appropriate department head to give it to for response; the counselor was required to maintain a log book; and once the department head responds, he can either send the response back to the inmate through the institutional mail system or the counselor can pick it up and deliver it to the inmate. [Tr. Vol.3, p. 78, 82].

Titchenell explained that the process was designed at that time to create communications between the inmates and their counselors/staff.  However, if it became apparent a department head was not going to administer BP8s she would accept things [BP9s] without a BP8. [Tr. Vol3, p. 32-42, 87].  Titchenell provided a detailed explanation of how the process worked during the fall of 2006 with respect to submitting the informal BP8 to a counselor to the rejection of a formal BP9. [Tr. Vol. 3, p. 52-54].  She further explained that the inmate was not provided with a receipt filed out and torn from the bottom of the original BP9.  Instead, the practice between September and December 2006 was that once she received the BP9, she entered it into the Sentry System and the counselor could later go in to the system through his terminal and print off a receipt and give it to the inmate. [Tr. Vol. 3, p. 75-77, 81].   Even though Titchenell's office is not involved with processing of BP10s and 11s, when they are filed or responded to, notice is received in the Warden's office and a copy is put in Administrative Remedy Files.  The inmate may receive notice in  two ways: 1) mail ( at the same time it is mailed to the Warden it is mailed to the inmate) directly to the

inmate or 2) delivered to the inmate by the counselors after taken from the Sentry System. [Tr. Vol. 3, p. 86]. While Titchenell recalls putting BP10 and 11 responses in the box for distribution to inmates by counselors, she cannot say the BP10s were actually issued to the prisoner. [Tr. Vol. 3, p. 99].

If an inmate does not receive a timely response to his BP9, he has the option under the policy of filing a BP10 and after filing a 10 of filing a BP11. [Tr. Vol. 3, p. 83]. Anytime in the process that the time for a response has expired the inmate has the option of moving to the next level. [Tr. Vol. 3, p. 86].

Titchenell testified she was confident the counselors were imparting to the inmates the information necessary to use the informal and formal administrative remedy resolution process between September and December 2006 because she received BP8s and BP9s from inmates other than Hill during that period and because she received BP9 which involved a "sensitive issue" raised in the original BP8 and 9 and the inmate had not received or was dissatisfied with the response and she had received some BP9s when the original BP8 or BP9 had put multiple issues in one document and were rejected for doing so. However, she could not say the inmates were being told they could file or refile BP9s when they did not have a BP8 rejection to attach [Tr. Vol. 3, p. 94-96]. The policy was for the inmate to put one issue on each BP8 or 9 filed so the BOP could address one issue at a time. [r. Vol. 3, p. 97].

Richard Milton, unit manager at USP Hazelton testified during the period from September to December 2006 that with respect to access and processing BP8s it did not matter whether the inmate got the form from a unit C or a unit D counselor. [Tr. Vol. 3, p. 125-127].

Pamela Garcia, SHU Counselor during the fall of 2006 testified she handed out BP8s and

16

BP9s to inmates in the SHU and maintained a log book of the forms she handed out to inmates.

Rapunzel Stevens-Clements, C unit case manager during the fall of 2006 at Hazelton, testified she handed out BP8s and BP9 forms to inmates in the SHU who were not from her assigned unit but did not maintain a log book or other written record of the forms she handed out. [Tr. Vol. 3, p. 158-159].

**Sub-claims 1-1 and 1-2**

It appears undisputed that Hill was placed in the SHU on arrival at Hazelton on September 12th, 2006.  His Intake Screening Form [Plaintiff's Ex. 19] showed him cleared for general population. Hill arrived at USP Hazelton from Oklahoma transit on September 12, 2006 at approximately 4:54 pm. [Pl. Ex 19].  At Oklahoma an administration segregation order had been entered which prevented Hill from being admitted to its general population because of his past history. [Tr. Vol 2, p. 113-114].  Exhibit 19 [intake page] reflects that Hill identified himself as a member of the Bloods Gang.  Hill had 33 pages of "shots"[prison slang for "incident reports"].  [Tr. Vol 2, p. 113].  Hill lied to the intake interviewer at Hazelton by stating that Maria Spitz was his attorney when she was not in order to have unmonitored phone calls.  [Def. Ex. 3][Tr. Vol 2, p. 115-117].  Hill testified Lt. Etris told him he was being sent to the "bucket" [SHU] because he liked to file suits.  Plaintiff's Ex. 18 reflects Hill requested protection and Lt. Clements signed off on Hill being assigned to Administrative Detention [SHU] on September 21, 2006.  Hill denies he asked for protection.  Plaintiff's Ex 18 states: "You are being placed on Administrative for (Code 307 Refusing to obey a order of any staff member)."

Hill testified and complained the conditions in the multipurpose room were inadequate for several reasons: (1) there was a mattress on the floor; (2) there was no toilet, and staff provided Hill

with a plastic urinal in which to urinate and a plastic bag and crate in which to defecate; (3) an air vent blew cold air continuously; (4) the cell smelled of feces; (5) the lights were never turned off; (6) staff provided Hill with food and water through the same slot that Hill placed the used plastic urinal and plastic bag; (7) the cell did not contain a sink; and (8) the warden and his executive staff observed these conditions while making their weekly rounds of the SHU and did nothing about the conditions. [DE 1][Tr. Vol. 1, p. 14-15[5]].

Notwithstanding that Hill considered being placed in the SHU at Hazelton as retaliation for his being a filer of claims against corrections officers, he testified that the retaliation did not "stop him from filing and proceeding through with the remedy process."   [Tr. Vol 2, p. 111].   Hill said he obtained BP8 forms from his unit counselor, Marrero during his first week at Hazelton.   [Tr. Vol 2, p. 117].   Hill alleges he submitted an Attempt at Informal Resolution form [BP8] to his unit counselor on September 15, 2006.

Marrero was a counselor assigned to C1 and C2 units in September 2006. [Tr. Vol. 2, p. 209]. As unit counselor, Marrero was responsible for visiting C1 and C2 inmates on the units and in the SHU and did go to the SHU at least once per week. [Tr. Vol. 2, p. 211-212].   Between September and December 2006, because of the overload of inmates, there was also a SHU counselor - Garcia who was added and was responsible for picking up all the paperwork [BP8s, BP9's]. [Tr. Vol. 2, p. 212].

Hill testified the counselor was unable to address Hill's issue via the informal grievance

_____

[5]Post hearing and post receipt of the transcripts from the hearing, Hill filed corrections indicating that the dates set forth in the transcript as December 15, 2006 [Tr. Vol. 1, p. 16, line 21-22, Tr. Vol. 1, p. 17, line 14-15,and Tr. Vol. 1, p. 18, line 10-11] should read "September 15, 2006. [DE 167].  Hill also noted two other corrections to the transcript in the same filing.

process so the counselor gave Hill a Request for Administrative Remedy form [BP9] that Hill returned to the counselor after completing the necessary portions of the form.  This BP9 was filed as 427215-F1 on September 15, 2006. [Tr. Vol. 1, p.8-9].  Hill testified that he waited fifty days to allow the Warden's extension time to pass but never received a response to his BP9.  [Tr. Vol 2, p. 101]. Then, Hill testified he mailed a BP10 to the Regional Director's office, which rejected his BP10 because Hill failed to attach BP8 and BP9 responses to his BP10. [Tr. Vol. 2, p. 102].  Hill testified he pursued the final step of the administrative remedy process after receiving notice that his BP10 was rejected by filing a BP11 with the Office of General Counsel.  He maintains the BP11 was rejected for failure to attach prior appeals relevant to this claim. [Tr. Vol. 1, p. 11-13 and Tr. Vol. 2, p. 102].  Hill stated it was his position "that when they simply don't respond to the administrative remedies, they [the administrative remedies] are not available."  [Tr. Vol. 2, p. 103].   He also submits that claim 1-1 did not need to be exhausted because it was an act of retaliation. [Tr. Vol 2, p. 103-105][Pl. Ex. 20].

### Sub-claim 1-3

Hill was moved from the SHU to general population in C2 unit on September 15, 2006.  [Tr. Vol 2, p. 125].  Hill was placed in an upper bunk.  Hill complained because he had a bottom bunk pass.  Hill contends he asked Counselor Marrero to move him to a bottom bunk because he had a bottom bed pass that was issued by BOP medical staff, and Marrero denied Hill's request.  Because of this denial, Hill alleges he requested a BP8, and Marrero refused to give a form to Hill.  Hill testified he filed a BP8 relative to the bottom bunk pass situation. [Tr. Vol. 1, p. 21].  Notwithstanding his allegation, Hill testified he delivered a completed BP8 form to Counselor Marrero concerning Marrero's refusal to provide Hill with a bottom bunk. [Tr. Vol 2, p. 126].  Hill

19

further testified Marrero threatened to send Hill back to the SHU if Hill continued to ask for BP8 forms. [Tr. Vol. 1, p. 20]. Hill testified he filed BP8, BP9 and BP10's relating to the bottom bunk issue and did not receive a response. [Tr. Vol. 1, p. 23]. Hill indicates that he never received a response to his BP8; therefore, he completed a BP9 form and returned it to Marrero. [Tr. Vol. 1, p. 24-25[6]]. Hill contends he never received a response to the BP9. After not receiving a response, Hill testified he filed a BP10 with the Regional Director, but the BP10 was denied because Hill failed to attach a BP8 and BP9 to his BP10. [ *Id* at 25]. Further, Hill contends he filed a BP11, but it was rejected due to his failure to attach the corresponding BP8, BP9, and BP10. [*Id*. at 25-26].

Marrero admits he took BP8s from Hill and denies that he ever took a BP8 from any inmate and "did not deliver it to the proper department head or route it the way it was supposed to go." [Tr. Vol. 2, p. 214, 220]. Marrero testified he would also collect BP9s and turn them over to the warden's secretary. [Tr. Vol. 2, p. 215]. Marrero describes his job with respect to BP8's and 9's as a conduit - he picks them up and delivers them to someone else. He generally does not fix the problems raised in the BP8s unless it involves legal calls, bottom bunk passes or things that have to do with the unit. He does not keep records of time limits or deadlines or filing dates. [Tr. Vol. 2, p. 216]. In actual practice, any case manager counselor, or member of the unit team would pick up BP8s and BP9s and take them to where they needed to go. [Tr. Vol. 2, p. 217]. Marrero denies: 1) he failed to make visits to the SHU to see people that were in his charge; 2) he walked in the SHU, signed in and then walked out; 3) he received a medical pass authorizing a bottom bunk for Hill and refused to provide it; 4) Hill complained about the BP8 process; 5) Hill told him he had been

---

[6]Post hearing and post receipt of the transcripts from the hearing, Hill filed DE 167 noting that Tr. Vol. 1, p. 24, line 25 should be corrected to read "on the top bunk."

threatened or felt in danger because of his filing of administrative remedies; or 6) he told Hill he was going to send him to the SHU for filing administrative remedies or asking for a bottom bunk pass. [Tr. Vol. 2, p. 223-226]. Marrero denies he "ever deliberately [withheld] forms from any prisoner or inmate. [Tr. Vol. 2, p. 241]. Marrero testified he made his regular rounds during the entire time at issue in this case. [Tr. Vol. 2, p. 244].

Notwithstanding his sworn testimony to the contrary [see [Tr. Vol. 1, p. 11-13 and Tr. Vol. 2, p. 102][Tr. Vol. 1, p 23-26], Hill further admits that Gov't Ex 1 and 2 reflect that no rejection notice was ever sent to him on any of his claims he says he filed during the relevant time period [September 15, 2006 and December 15, 2006]. [Tr. Vol 2, p. 110, 124].

He also complained about not being permitted to have unmonitored legal calls. [Tr. Vol 2, p. 125-126].

**Sub-claim 2-1**

Hill  testified that when he was transferred from the SHU to C2 in general population, Correctional Officer [C.O.] Morgan acted improperly by reading Hill's legal mail, using racial slurs, and confiscating Hill's copy of *Blood in my Eyes* by George Jackson. [DE 1][Tr. Vol. 1, p. 27][Tr. Vol 2, p. 127]. Hill never explicitly alleges the date of this incident; however, he indicated the incidents described in 2-1 and 2-2 happened on the same day. Further, Hill contends this is the underlying incident that led to his altercation with Lt. Clements, which is outlined in sub-claim 2-2. [*Id.* at 29]. Hill contends he filed a BP8 to which the BOP never responded. [Tr. Vol. 1, p. 27]. Hill asserts that he subsequently filed a BP9 which was also garnered no response. [*Id.* at 27-28].

Titchenell testified that Hill's September 15, 2006 BP9 did not require a BP8 attached because it was considered a "sensitive BP9." She explained a sensitive BP9 was anything that

affected the safety and security of the institution or an inmate.  Since the BP9 alleged Hill was called a derogatory name[7], that made it a sensitive BP9. [Tr. Vol. 3, p. 24-25, 28].  Titchenell sent the September 15, 2009 BP9 to SIA [special investigative agent].  A computer entry reflects the BP9 was responded to on March 23, 2007 but Titchenell cannot verify Hill actually received the response. [Tr. Vol. 3, p. 29-30, 26].  Moreover, since it allegedly involved staff misconduct, the policy was not to disclose to the inmate the results of the investigation or whether or not a staff member was disciplined. [Tr. Vol. 3, p. 83].

**Sub-claim 2-2**

Hill went to Lt. Clements to talk to him about Morgan.  He testified that Lt. Clements told him that he should have not written a BP8 on C.O. Morgan.   In response, Hill alleges he told Lt. Clements that it was his  "right to report staff misconduct and seek redress[.]" Hill claims Lt. Clements then told Hill to get out of his office, and Hill responded by quoting regulations from Chapter 28 of the Code of Federal Regulations [C.F.R.].  In addition, Hill alleges Lt. Clements took the C.F.R. from Hill, pushed Hill against the wall, handcuffed Hill, and then told another C.O. to take Hill to the SHU.  Hill claims that his books have never been returned. [DE 1][ [Tr. Vol. 1, p. 29-30][Tr. Vol. 2, p. 128-131].

However, David Young, Executive Assistant to the Warden at USP Hazelton says he returned the CFR book to Hill on or about March 29, 2007.  [Plaintiff's Ex. 5][Tr. Vol. 1, p. 37-38][Tr. Vol 2, p. 98-99].

Based on Hill's assertion that the events described in 2-1 and 2-2 occurred on the same day and a corroborating BOP document which indicates Hill was sent to the SHU by Lt. Clements on

---

[7]Hill claims he was called a "monkey."

22

September 21, 2006 for refusing to obey an order from a staff member [Plaintiff's Ex. 18], it appears that the incidents described in 2-1 and 2-2 would have occurred[8] on September 21, 2006. [Plaintiff's Ex. 18]. In further support, a BOP document indicates Hill was admitted to the SHU on September 21, 2006. [Gov't Ex. 8]. In addition, his room code matches the room he was first assigned to during the time he claims he was in the SHU multipurpose room. [*Id.*]. Hill contends he did not exhaust his administrative remedies with respect to this claim against Clements or Spotlan because, at hearing before the unit disciplinary committee, the incident report of refusing a direct order was expunged from his record and he was unable to and did not need to file an administrative remedy prior to including the claim in the subject suit. [Tr. Vol 2, p. 100, 131, 138]**.**

Hill testified he does not distinctly recall filing a BP10 on the opening of mail and racial slurs claims [Sub-claim 2-1]. [Tr. Vol. 2, p. 134].

Hill alleges he filed a BP8 following this incident and never received a response. [Tr. Vol. 1, p. 30]. After allegedly receiving no response, Hill filed a BP9 (430582-F1) on October 16, 2006. The BP9 was rejected because BOP stated Hill never sought informal resolution. [*Id.*]. In response to the BP9's rejection, Hill contends he filed a BP10, which was later rejected due to BOP's assertion that he failed to seek informal resolution at the BP8 stage. [*Id.* at 30]. Hill never alleged he filed a BP11 concerning the issues described in sub-claim 2-2. [*Id.*].

Hill testified he did not receive the Rejection Notice from the administrative remedy coordinators and did not therefor resubmit his rejected BP9 because he was in Oklahoma City transit and his mail was not forwarded to him. [Tr. Vol. 1, p. 32-33]. Hill argues that when he is in transit

---

[8]The undersigned expresses no opinion whether the events occurred as alleged. Such opinion is unnecessary at this juncture of the case.

he is in BOP custody and they know where he is and it is their obligation to get the rejection of his BP9 to him timely. [Tr. Vol. 1, p. 34].

Hill contends that he filed a BP10 which was rejected by the Regional Director because Hill had no proof that he sought informal resolution through the BP8 grievance process. [*Id.* at 28]. Hill admitted the BP 9 did not appear on the Administrative Remedy Generalized Retrieval Sanitized Form [Plaintiff's Ex. 4] and contended it did not because it was not processed. [*Id.*]. Hill maintains that after his BP10 was rejected for failure to attach prior grievance forms, he filed a BP11 which was rejected for failure to attach prior grievance forms. [*Id.* at 29]. Notwithstanding his earlier testimony, Hill testified later in the hearing that: "No, once Lieutenant Clemmons took the act of retaliation, I don't recall whether on not I actually filed a BP10. But once he actually took the act of retaliation of having me placed in the special housing unit I don't recall whether or not I wrote - - once the incident report was expunged - - in other words, I don't believe that I wrote that one. I'm not too certain of." [Tr. Vol. 2, p. 128, 138].

Complicating the matter further, Hill testified he sent over 10 BP9's relative to various claims through the institutional mail system; was sent by writ to another state for court; got rejection notices on his return to Hazelton; and is not able to say which claims were specifically rejected for lack of informal resolution [BP8]or whether he exhausted any of the claims he had filed. [Tr. Vol. 2, p. 135-138].

**Sub-claim 3-1**

Hill was sent to the SHU on September 21, 2006.

Hill did not file a BP8 regarding the SHU conditions he lived in after being sent to the SHU by Lt. Clements. [Tr. Vol. 1, p. 45]  Hill claims he was unable to file a BP8 because an incident

report was filed against Hill for his conduct leading to him being sent to the SHU. [*Id*]. Hill testified that this incident report was eventually expunged from his BOP records; however, BOP policy did not allow him to subsequently file a grievance as the matter was previously adjudicated by a Disciplinary Hearing Officer [DHO]. [*Id.* at 46]. Hill affirmed that he is making no claims concerning the SHU overcrowding outlined in his complaint in paragraph H under the third claim. [*Id.* at 46]. *See Compl.* [DE 1]. Moreover, Hill testified he did not file a BP8 or 9 on this claim because 1) he could not get forms from Counselor Marrero and 2) once you file an incident report on the matter, you cannot file a BP8 or 9 on the incident even if the incident is expunged from your record. [Tr. Vol. 1, p. 46-47]; then he testifies he could not file a BP8 [ Tr. Vol. 1, p. 47 and 52] but did file a BP9 which was rejected because he did not attach a BP 8 [Tr. Vol. 1, p. 47]; and then Hill testified that Exhibit No. 7 is a BP 9 filed October 15, 2006 which says: "On September 21, '06, after being placed in SHU, C.O. Spotlan had me placed in a cell with four other people. I had to sleep on the floor by the shower. I was then placed in a five - man cell." [ Tr. Vol. 1, p. 47-48]. Hill testified the Government did not respond to his BP9. [Tr. Vol. 1, p. 52]. Finally, in an effort to clear up the matter of whether he filed a BP8 and/or BP9 relative to the September 21, 2006 SHU incident, Hill testified "It's possible. I mean, I filed a number of BP9s, and it's been six years. It's possible that it could relate to that incident, but I just believe that it relates to the incident where I was moved upstairs with the other people in the cell while I was sleeping on the floor. I just believe it relates to that one. But it's possible." [Tr. Vol. 1, p. 51]. On cross examination Hill testified: "I'm pretty certain I wrote a BP10 and BP11 on it [multipurpose room]; did not get a response to it; and it is not recorded in Gov't Ex. 1 or 2. [Tr. Vol. 2, p. 139]. Further Hill testified, he is sure he did not fail to file because he considered being put in the SHU as retaliation because he "wanted

them to be aware of that [the conditions of the SHU multipurpose room]. [Tr. Vol. 2, p. 140].

Hill further testified that he did not get timely responses to his filed BP8 and 9's.  He believed they were either not processed out of retaliation or not timely responded to.  With respect to the claimed retaliation by Spotlan during the September 21, 2006 incident Hill testified he filed a sensitive BP10 with an unidentified associate warden  but it, like others, was rejected as not being sensitive enough.  There is no record of such a filing or rejection aside from Hill's testimony.  Hill further testified he always filed BP9's: "I just know that when I don't receive responses immediately, what I do is simply write the next level."   [Tr. Vol. 1, p.  55-56].

**Sub-claim 3-2**

Hill contends he was placed in the multipurpose room again after returning to Hazelton on November 28, 2006 and found himself living in the same conditions that he experienced upon his initial arrival at Hazelton.  *See* Sub-claim 1-2.  [DE 1].  BOP records confirm Hill was placed in the SHU after returning to Hazelton on November 28, 2006.   [DE143-32]

Hill alleges that he was unable to obtain a BP8 from Marrero to properly pursue informal resolution.   [Tr. Vol. 1, p.  47].  Due to his inability to obtain a BP8 form, Hill alleges he filed a BP9.   Contrary to Hill's testimony, Rapunzel Stephens-Clements, a case manager in C unit of Hazelton between September and December [Tr. Vol. 3, p. 153-154], testified that, as part of her duties, she handled inmates' complaints and visited the SHU weekly.  She provided inmates with BP8 and 9 forms even if they were from a unit other than C.  [Tr. Vol. 3, p. 154]. She carried a six-part folder with her which included BP8s and BP9s.  [Tr. Vol. 3, p. 158].  She did not keep a log book or written track of the BP8s and BP9s she handed out to inmates. [Tr. Vol. 3, p. 158-159]. Pamela Garcia testified that between September and December 2006 she was employed at USP

26

Hazelton as a SHU counselor.   [Tr. Vol. 3, p. 163-164].   Other than the time period of September 12-22, 2006 she was generally available for duty when scheduled.   [Tr. Vol. 3, p. 164].   She testified when she made daily rounds in the ranges in the SHU she had a file box on a cart in which she carried BP8 and BP9 forms.   [Tr. Vol. 3, p. 165].   She kept a log book of the BP8s and BP9s.   [Tr. Vol. 3, p. 166-167].   Moreover, she witnessed weekly executive rounds where the Warden and department heads would go through the SHU stopping at every inmates cell.   [Tr. Vol. 3, p. 167]. Richard Milton testified that on June 1, 2010 he retired from UPS Hazelton where he had been a Unit Manager for six (6) years.   [Tr. Vol. 3, p. 123].   During the period of September 2006 to December 2006 he was unit manager at C and D units involved in supervision of staff and coordination of program reviews.   He also shared in disciplinary actions.   His unit staff consisted of a unit secretary, counselor and case manager.   He had two counselors in D and one, Marrero, in C. [Tr. Vol. 3, p. 124-125].   Subject to an emergency situation, it was the standard that one unit counselor would visit the SHU inmates once per day.   He confirmed Garcia's testimony that, under both Warden Haynes and later under Warden Driver, weekly executive rounds were performed and he or his assignee joined the Warden during the rounds which were called "executive visits."   [Tr. Vol. 3, p. 128].   During the relevant time Milton has no recollection of Hill complaining that Marrero was unresponsive to his needs with respect to BP8s or BP9s. [Tr. Vol. 3, p. 130].   Although Milton did not carry BP8 forms with him on the Thursday executive rounds of the SHU, those forms were readily available in the SHU through the assigned counselor.   [Tr. Vol. 3, p. 135].

Hill introduced the testimony of four witnesses to support his claims that he could not get administrative remedy forms, the staff refused to process administrative remedy forms that were filed by inmates and that staff retaliated against inmates who filed administrative remedies against staff:

27

Devlin Bland, Raynard Dorsey, Albert Palmer and Charles Brooks.

Devlin Bland testified he was an inmate at USP Hazelton between December 2005 and February 2007. During his stay he filed a BP8, BP9 and a tort claim. He asked Counselor Marrero for BP8 forms more than twice: directly and by "cop out."[9] Marrero did not provide him with the forms. So, Bland obtained his BP8 from Garcia, the SHU counselor. The first BP8 filed was for the property he did not get when he was transferred from C unit to the SHU in June 2006. Bland was instructed by Garcia to turn in his BP8s to his unit counselor-Marrero. He also filed a BP8 for a book he received in the mail but wasn't put into his personal property. Bland testified he gave his first BP8 to his unit counselor - Marrero and the second he put in the institutional mail addressed to Mr. Marrero. Bland did not get a response to his two BP8s and that is why he filed his tort claim. Bland did not file a BP 10 or 11 with respect to either claim before filing his tort claim and acknowledged the failure to exhaust was the basis for the dismissal of his tort claim. Between September and December 2006 Bland recalls seeing Marrero in the SHU three to four times and he recalls Hill asking Marrero for BP8's. Bland testified a counselor could be on one of the six ranges in the SHU and not be seen by inmates on other ranges in the SHU. The only time Bland and Hill were on the same range in the SHU was when they both were housed on Range Six. Bland recalls one instance where Lieutenant Trait confiscated property from Hill. [Tr. Vol 2, p. 21-44].

Raynard Dorsey was at USP Hazelton during the fall of 2006. Dorsey was initially assigned to the SHU in a multipurpose room with no toilet, no beds, and a light which stayed on all night. Dorsey asked for a BP8 form to complain about the conditions but did not receive one. He recalls Hill receiving a BP8 and filing it but not getting a response. Dorsey testified he filed a BP8 with

---

[9]Prison slang for administrative note between inmates and prison staff members.

Church once he was assigned to his regular unit.  When he did not receive any response he asked Church about it and he testified she told him not to pursue it and he did not.  [Tr. Vol 2, p. 53-60].

Albert Palmer testified that between May 5, 2006 and 2007 he was an inmate at USP Hazelton.  In September 2006 he was in the SHU and the counselor was Van Johnson.  Palmer got administrative remedy forms from counselor Johnson but testified Johnson did not process them properly on a number of times.  Palmer testified  Hill told him he was having difficulty getting administrative remedy forms.  According to Palmer the forms were uniform and he did not recall them having tracking numbers.  [Tr. Vol 2, p. 62-70].

Charles Brooks testified that while he was an inmate at USP Hazelton he attempted to file "15 different grievances process, and they [BOP] won't process it because it was something to do with staff misconduct."  He testified he gave his BP8's to his unit team counselor, a woman, pursuant to "BOP policy, a technical reference manual 1301.02. ... And when I give it to her, she never processed it."  [Tr. Vol 2, p. 74-75].  Brooks testified Lieutenant Trait was "very aggressive."  He testified there were about 10 inmates who tried to filed administrative remedies and "no one in the SHU could file against these officers" because "[t]hey refused to let your property - - the stuff go out. They mess with your mail and stuff like that.  They make it hard.  It's impossible to file.  That's why you can't - - it is impossible to exhaust your administrative remedy.  They make it unavailable."  [Tr. Vol 2, p. 77].  He testified with respect to difficulty obtaining administrative remedy forms: "And most time they don't come.  So the person that don't come, your real counselor of your unit, sends another counselor to come, and actually she will write it down, and then you will ask that counselor that's not your counselor for the forms, and she says, I can't give it to you, you got to get it to your counselor, who never comes.  So they got a way around everything, and they make sure that you are

29

untimely.  So, your filings won't - - it won't be rejected if you do make it."  [Tr. Vol 2, p. 78 and 79-80].  Brooks testified and complained that since he had agreed to help Hill by testifying, the staff at the prison in which he was located at the time of his testimony - USP Tucson, Arizona - retaliated against him by taking him out of his handicapped cell, placing him in the SHU on false disciplinary charges and by taking away his papers he needed for his testimony, his wheelchair and his pampers thereby causing him to urinate and defecate on himself.  [Tr. Vol 2, p. 82-83].  Brooks testified: "The squad, you - - anybody that you file on is going to attack you.  They get these - - I don't ever say squad, like crew, like co-workers, and they move against you to stop you from completing the remedy, because they know that if you don't, the Judge will throw out your case.  So that's the whole - - they make you live bad and deny you hygiene and everything, handcuff you, be assaulted, spit on you, stuff like that.  They put you in a multipurpose room so you can't wash, no sink, and you staying in there for months and months, like Mr. Hill and me.   And then they hide the tape and the tape disappear."  [Tr. Vol 2, p.  86].  Finally, Brooks testified with respect to giving grievance forms to a counselor to process while in the SHU: " Well, if I - - if you got to give your stuff to the lieutenants or people, they don't let you take it - - send it out.  If you send something out, you got to keep it open.  So they don't let you seal your mail when you're in the SHU.  You give it to them, they scan it, but then they take it, and you never see them shred it, so allowing stuff to go there is take tooken [sic] out, so by the time they go there, it is probably two pieces of paper.  Other administrative remedy forms when you need ten, and attached, and all of it is gone, and then they send it back to you and say rejected because you didn't give us four copies of the form administrative remedy, and they reject you.  And you say, oh, man, I didn't have no stamps, so I had to give it to my counselor to put a stamp on for me because they won't give me a stamp.  So now you got to entrust the same

30

people that beat you to send your stuff out, and they won't do it.  They - - I mean, it ain't never going to go out right."  [Tr. Vol 2, p. 87-88].

Hill contends the BP9 was later rejected because Hill had not sought informal resolution by filing a BP8. [Tr. Vol. 1, p. 47].  Further complicating the situation, Hill testified he abstained from dating his BP9 because he was uncertain of the date at the time he filed the BP9.  [Tr. Vol. 1, p. 48].  However, Hill indicated he believed this particular incident was not recorded on the BOP's listing of his BP9 grievances.  [Tr. Vol. 1, p.  49][Tr. Vol. 2, p. 139-140][see also further evaluation of record in sub-claim 3.1 herein].

**Sub-claim 3-3**

Hill maintains he attempted to file BP8s against C.O. Spotlan and Lt. Gifford for placing Hill in overcrowded cells and confiscating Hill's personal property and mail.  Hill alleges Spotlan and Gifford targeted him due to his tendency to file administrative grievances. [DE 1].  Hill claims he is uncertain when the alleged conduct took place because he abstained from recording dates on his grievance forms.  [Tr. Vol. 1, p.  at 48].  Hill affirmed that the BP10 he claimed he filed against Spotlan and which was rejected did not appear on Gov't Ex. 1 or 2. [Tr. Vol. 2, p. 140].

Hill believes he filed a BP8 grievance regarding these incidents but never received a response from Counselor Marrero.  [Tr. Vol. 1, p.  49].  Hill also believes he filed a BP9 that was later rejected; however, there is no evidence of this BP9 within BOP records.  [Tr. Vol. 1, p.  49-50].  Further, Hill contends that he filed a sensitive BP10[10] because he believed these actions were being

---

[10]  An inmate may file a sensitive BP10 if he believes it is an emergency situation which warrants immediate BOP response; however, BOP may decline to consider such grievances if it is determined that the inmate's grievance lacks immediate seriousness.  During his testimony, Hill indicated he understood an appropriate time to file a BP10 would be if his life was in danger or if staff members retaliated against him. [*Id.* at 54].

taken against him in retaliation to his grievances.   However, Hill claims the sensitive BP10 was denied because it was deemed to lack the requisite sensitivity to be addressed in that manner [Tr. Vol. 1, p.  54][see also further evaluation of record in sub-claim 3.1 herein].

**Sub-claim 3-4**

Hill alleges prison mail room staff refused to mark his incoming legal mail appropriately and withheld his legal mail at various times when he was in the SHU and when he was out of Hazelton for court from October 17, 2006 until November 28, 2006.   [Tr. Vol. 1, p.  79][Tr. Vol. 2, p. 146]. *Also see* [DE 143-32].  Further, he accuses C.O. Morgan of reading his legal mail and informing other correctional officers of Hill's impending legal actions against correctional officers.  Hill argues that this left him vulnerable to staff retaliation.  [DE 1].

Hill maintains he filed a BP8 on this issue and never received a response.  [Tr. Vol. 1, p. 80]. Hill is uncertain whether or not he filed a BP9 related to this issue. [*Id*].  There is no record of this BP9 in BOP records. [*Id*].  Later on cross examination Hill testified he was sure he filed a BP9, 10, and 11 but got no response and that Gov't Ex. 1 and 2 did not reflect any BP 10 or 11. [Tr. Vol. 2, p. 146].

Hill testified he only saw his Unit Counselor, Marrero, twice between September 12, 2006 and December 27, 2006; that Marrero refused to come to the ranges and cells within the SHU; that because Marrero refused to visit the SHU Hill was deprived of the chance to obtain and file BP8's and 9's during this period with respect to his claims that his legal mail was being withheld from him; that the log book used for sign in and out of the SHU was not produced by the Government in discovery; and, the inmate activity record produced in other litigation [Plaintiff's Ex. 13] shows Hill's substantive contacts with Marrero.  [Tr. Vol. 1, p. 79-86].

32

**Sub-claim 3-5**

After Hill's return to Hazelton on November 28, 2006, Hill alleges C.O. Spotlan threatened to kill him if he continued to file requests for administrative remedies. [Tr. Vol. 2, p. 147]. Hill accused Spotlan of attempting to have other prisoners attack him and accuses Spotlan of referring to Hill as a "snitch" in front of other inmates. [DE 1]. *Also see* [Tr. Vol. 1, p. 86][Tr. Vol. 2, p. 93]. [DE 148]. During the second day of the evidentiary hearing, Hill indicated he filed a BP8 on the issue and wrote a letter to Warden Driver; however, he never completed the subsequent grievances concerning this incident. [*Id*]. Hill filed his complaint in this action before time had expired for the Warden to respond to his BP8 or for him to consider it rejected due to passage of time and file a BP9. [Tr. Vol. 2, p. 148].

**Sub-claim 3-6**

Hill alleges that after he returned from court on November 28, 2006, he was denied access to paper, pens, personal hygiene items, and reading materials due to his persistent filing of administrative grievances.

He maintains that the denial of pens and paper prevented his ability to file administrative remedy grievances and prevented him from properly litigating cases. [DE 1].

Hill admits he did not exhaust his administrative remedies about denial of the pens because he wrote Warden Driver; the associate warden responded because Warden Driver was unavailable and substituted pencils for the pens in the SHU; the pencils could not be used to file BP9s; on Warden Driver's return pens were restored to the inmates in the SHU; and, when Warden Driver left for heart surgery, Lt. Trait again removed the pens from the SHU. Later, acting Warden Martinez returned the pens to the SHU rendering the complaint moot. [Tr. Vol 2, p. 97-98]. Hill further

33

explained he did not exhaust because he viewed the removal of the pens as retaliation which did not require him to exhaust.  [Tr. Vol 2, p. 98].

Hill testified on cross examination that he was not required to exhaust his administrative remedies because he had received the pens from Warden Driver and Assistant Warden Martinez through informal discussions with them and was not required to start the administrative process all over again when Trait took the pens away.  [Tr. Vol. 2, p. 149-152].  Contrary to Hill's testimony that he would talk with Warden Driver during weekly rounds, Warden Driver stated in his filed declaration that he does not recall Hill asking him anything about administrative remedy. [Gov't Ex. 5][Tr. Vol. 2, p. 153-155].

Despite making more individualized sub-claims in his complaint, Hill indicates that he filed a BP8 regarding this incident which included his complaints concerning sub-claim 3-3 [Tr. Vol. 1, p. 55].  However, Hill claims the BP8 never garnered a response. [*Id*].  Therefore, Hill alleges he filed a BP9 on December 6, 2006, which Hill believes was processed by BOP as Administrative Remedy 435878-F1.  [Tr. Vol. 1, p. 56, 61].  Hill contends his BP9 was rejected; therefore, he filed a BP10 on the issues contained in the BP9.  [Tr. Vol. 1, p. 58].  Hill alleges this BP10 was rejected because Hill failed to provide proof that he had filed a BP8 and BP9.  [Tr. Vol. 1, p. 58].  Hill maintains he then filed a BP11; however, it was similarly rejected.  [Tr. Vol. 1, p. 59].  However, Gov't Ex. 1 and 2 do not show any rejection of such a BP 10 or 11.

Notwithstanding his testimony noted above,  earlier in the transcript with respect to the issue of alleged "retaliation by Lt. Trait" Hill testified he was uncertain when he filed a BP8 concerning this claim.  However, he testified he did file a BP8 within five days of the incident.  [Tr. Vol. 1, p. 109, 110].  Hill also alleges he wrote a letter to the warden concerning the events leading to this

grievance, but this document as filed on record is illegible. [*Id*]. [DE 33-2:5]. Hill testified he wrote Warden Driver because Lt. Trait had written a memo to remove all ball point pens from the SHU in order to prevent the inmates from filing BP8s because they had to be written in ballpoint pen. [Tr. Vol 2, p. 93]. Hill testified he knew that was Lt. Trait's reason for taking the pens "[b]ecause Lieutenant Trait repeatedly came to my door when he would make round on the range and told me that I needed to stop filing paperwork. I needed to stop writing these BP8s, because when I wrote the BP8s, they were referred to him to do the response on the BP8s , and so I was bombarding him with paperwork, he said." [Tr. Vol 2, p. 94].

**Sub-claim 3-10**

Hill asserts on December 13, 2006 and two days prior to Hill's filing this civil action, Lt. Trait offered "extra trays" of food to the first inmate to stab Hill. [Tr. Vol. 2, p. 159]. Hill maintains Lt. Trait made this offer in response to Hill's complaints concerning SHU conditions. [DE 1]. Hill contends this is the second time he was threatened by staff members as he had previously claimed he was threatened in sub-claim 3-5. [Tr. Vol 2, p. 92- 93]. Hill testified he did not file all administrative remedy grievances against Lt. Trait because "[he] was fearful of filing further with regard to Lt.Trait's conduct and threats." [ *Id]*. On cross examination, Hill testified he immediately wrote to Warden Driver about the incident but does not remember when he was able to obtain and file a BP8 on it. [Tr. Vol. 2, p. 159]. Hill contends this was an act of retaliation, and accordingly, Hill testifies: "So by the time it had reached to December, I was simply past waiting around for something to happen to me and had decided to go to court instead. Although I did follow-up and continue to attempt to file different administrative remedies with regard to other issues. After the complaint was filed, I was fearful of filing any further with regard to Lieutenant Trait." [Tr. Vol 2,

p. 93].  He also testified: "Because it is an act of retaliation, because he's retaliating against me for filing these complaints, that waives the exhaustion process....  You can't do this to me and tell me that I have to exhaust the administrative remedy process." and  "'Q. I got extra trays for the first inmate to stab you,' it is your position that is retaliation for filing administrative remedies, and that you were excused then from filing them over this incident?  A.  That's correct. [Tr. Vol. 1, p. 111]. Hill testified it was "correct" that he was "deliberately stopping the process after two levels instead of carrying it through to the four based on [his] understanding or belief that there was retaliation and you don't have to go any further." [Tr. Vol. 2, p. 161].

**Contention    BOP prevented Hill from exhausting administrative remedies by**

2)    failing to timely process the forms he filed; and

3)    failing to give him responses or copies of responses to claims he filed.

Hill produced Plaintiff's Ex. 7, 8, 11 and 12 in evidence.  He testified he found these copies of documents in his papers and that they prove he filed BP9's on 4 different claims during the relevant time period that weren't responded to by the BOP.  [Tr. Vol. 2, p. 164-166].  Hill admits Plaintiff's Ex. 7 is the top page of a 4 page BP9; Ex. 8 is the second page of a 4 page BP9; Ex. 12 is the third page of a 4 page BP9; and Ex. 11 is a fourth page that says "Third copy, return to inmate" of a four page document. [*Id.*].  The government argues these documents were created by Hill for litigation purposes from one BP9 which Hill tore apart using each page for separate claim.  Hill's explanation why the 4 documents are not all marked "third copy - return to inmate" or "original inmate" is: Hill would give his BP9 to Stevens when she came around during the week to give to Marrero; Hill would ask her to get him a copy; and, she copied them as presented in evidence. [Tr. Vol. 2, p. 162-167].

36

Hill produced Plaintiff's Ex. 9 in evidence to establish he filed a BP9 in exhaustion of his administrative remedy on his claims that his account had been frozen and he did not have funds to buy stamps or stamps to mail his remedies and Marrero was not coming around to pick up his administrative remedies.  Plaintiff's Ex. 9 signed by Hill reflected it was signed October 1, 2006 and that his unit was the SHU.  Hill was not in the SHU on October 1, 2006.  Hill's explanation was that he probably wrote the complaint while he was in the SHU but signed, dated and filed it after he left the SHU. [Tr. Vol 2, p. 167-168].  Marrero testified that Hill was in the unit from September 29, 2006 through October 9, 2006 and not in the SHU at this time and could have come to him for forms or to speak with him.  Marrero also testified from Def. Ex. 13, Hill's Inmate Account.  Marrero testified that for the period around October 1, 2006 only $197.36 of $235.46 in Hill's account had been frozen and the record showed on October 1, 2006 Hill put $20.00 on his phone; received a Western Union deposit of $140.00 on October 3, 2006; and spent $114.75 at the commissary on October 5, 2006.  Contrary to Hill's testimony and BP9 claims that his account had been frozen and he did not have money available to buy stamps or anything else, Marrero testified and Hill's Inmate Account verifies he had unfrozen funds in his account that were available for his use and that he did use during his entire stay at Hazelton.  [Tr. Vol. 2, p. 248-250].

Hill gave the same explanation for why Plaintiff's Ex. 10, a complaint about his inability to get BP8 forms because his counselor Marrero was not coming around and he could not get legal calls to his lawyer for his appeal and civil cases while he was in the SHU, was signed and dated October 5, 2006 when he was in C2 unit and not the SHU. [Tr. Vol. 2, p. 169].

Hill concedes he has no proof that he filed any BP8's or BP9's. [Tr. Vol. 2, p. 172].  Hill offered Plaintiff's Ex. 3 to show that he filed 4 claims [dated 9/15/06, 4/16/07, 4/16/07 and 4/24/07]

37

and the BOP closed each of the 4 claims long after filing without ever responding to them, to wit: 3/21/07, 8/15/07, 8/12/07 and 8/10/07. [Tr. Vol. 2, p. 181-186].  Hill admits that of the 4 claims, only the 9/15/2006 claim predates the filing of his complaint in this action. [*Id.*].  Immediately thereafter Hill reverses himself stating that there were as many as seven or eight claims that were shown on Plaintiff's Ex. 3 as rejected after the filing of the complaint but which Hill claims he filed with respect to incidents that occurred prior to the filing of the complaint. [Tr. Vol. 2, p. 202].  However, Hill admits that in the absence of actual copies of the BP9's he filed, he has no way to prove "that these issues was actually written up before." [*Id.*].  Hill also admits that no BP10's or BP11's for the 9/15/2006 claim or the other three claims appear in Gov't Ex. 1 or 2. [Tr. Vol. 2, p. 187-188].

According to BOP records, Hill filed two Request for Administrative Remedy forms [BP9] during his first assignment to Hazelton: (1) 427215-F1 and (2) 430582-F1 on September 15, 2006 and October 16, 2006, respectively.

During his second assignment to Hazelton, Hill filed another Request for Administrative Remedy: (3) 435878-F1 on December 6, 2006.  Hill's BP9 filed as 435878-F1 was rejected on December 7, 2006.

Hill  filed the instant action on December 15, 2006 alleging that he was denied access to the administrative remedy program because staff did not provide him with necessary forms or respond to the forms he submitted.  Further, Hill alleges that there are additional grievances he filled out and staff either refused to process the forms or destroyed the forms.  Thus, each claim of the instant action does not necessarily constitute an independent grievance and some of the claims listed in the instant action may not correspond to BOP records.  *See* [DE 1] and Pl's Ex. 3.

### V. Standards of Review

38

A.      **Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) [of the Federal Rules of Civil Procedure] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).   In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993); *see also Martin,* 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).   Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46.   In *Twombly*, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Conley,* 550 U.S. at 555 (citations omitted).   Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Id.*   (citations omitted), to one that is "plausible on its face," *supra* at 570, rather than merely "conceivable."   *Id.* Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim."*Bass v. E.I.DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir.2003) (citing *Dickson v.*

*Microsoft Corp.,* 309 F.3d 193, 213 (4th Cir.2002); *Iodice v. United States,* 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard; this standard was instituted by the Supreme Court in *Ashcroft v. Iqbal,* where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. *Id.*

**B.      Summary Judgment**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the *[non-moving party].*" *Id.* "*If the evidence is merely colorable, or is not significantly probative*, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt

rather than encourage mere speculation. *Anderson,* 477 U.S. at 248.  It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

## VI. Applicable Law

### A.      Prison Litigation Reform Act [PLRA]

The Prison Litigation Reform Act of 1995 [PLRA] was passed "to eliminate unwarranted federal-court interference with the administration of prisons, and thus[, the PLRA] seeks to 'affor[d] correction officials time and opportunity to address complaints internally before allowing the initiation of a federal case. [ . . .] The PLRA was intended to 'reduce the quantity and improve the quality of prisoner suits[.]'" *Woodford v. Ngo,* 548 U.S. 81, 93-94 (2006) (quoting *Porter v. Nussle,* 534 U.S. 524-25 (2002)).

### B.      Exhaustion of Administrative Remedy Process

Under the PLRA, a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all *available* administrative remedies. 42 U.S.C. § 1997e(a) (emphasis added).  Exhaustion is mandatory. *Booth v. Churner,* 532 U.S. 731, 741 (2001).  Like a § 1983 action, a *Bivens* action is subject to mandatory exhaustion requirements. *Porter v. Nussle,* 534 U.S. 516, 524 (2002).  The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes[.]" *Id.*  Further, exhaustion is required even when the relief sought is not available; therefore, futility is not a legal excuse for failing to exhaust the administrative remedy process. *Booth,* 532 U.S. at 741.  Because exhaustion is a prerequisite to filing a lawsuit, all available

41

administrative remedies must be exhausted prior to filing a complaint in federal court. *See Porter,* 534 U.S. at 524 (citing *Booth,* 532 U.S. at 741). Moreover, an inmate may procedurally default his claims by failing to follow the proper procedures. *See Woodford v. Ngo,* 548 U.S. at 81 (2006) (recognizing the PLRA provisions contain a procedural default component).

From the record, it is clear that before, during and after the relevant time period [September 2006 through December 2006], Hazelton and the BOP had a four-step administrative remedy process available to inmates.

First, to initiate the grievance process, an inmate must request a BP8 form from his or her unit counselor and return the BP8 to the unit counselor after filling in the necessary sections. This was the informal administrative process available in the prison. If this did not yield a satisfactory result, the prisoner could request a BP9 form and direct it to the institution's warden.

The BP 9 marks the beginning of the formal administrative process.

In the event that the BP9 was denied, a prisoner could appeal the decision to the Regional office via a BP10.

Finally, if a BP10 was denied, a prisoner could direct his final appeal to the Office of General Counsel in Washington D.C..

If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received. Once filed, response shall be made by the Warden or CCM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days. If the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after

filing. If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in writing to all filed Requests or Appeals. *If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of response to be a denial at that level.*

28 C.F.R. § 542.18 (West 2012) (emphasis added).

An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP–10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP–11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. [. . .]

28 C.F.R. § 542.15(a) (West 2012).

As § 542.18 indicates the inmate may consider a claim denied if he receives no response. Additionally, the inmate must timely file an appeal to a claim that is not responded to if he or she wishes to preserve the claim and continue the administrative remedy process. Section 542.15(a) imposes a burden on the inmate to file appeals in a timely manner.

**C.     Retaliation**

Although generally a prisoner must exhaust all available administrative remedies before filing a federal case, the requirement of proper exhaustion may be waived if the prisoner is

43

threatened or otherwise prevented from exhausting the administrative remedy process. *See Kaba v. Stepp,* 458 F.3d 678, 686 (7th Cir. 2006).

In *Kaba*, the inmate's case was dismissed by the district court because *Kaba* filed a federal lawsuit long before the BOP responded to his grievances.  However, when the appellate court considered the lower court's decision to dismiss the case on its merits, it indicated that when "[v]iewing the evidence in the light most favorable to Kaba, [it] cannot say that the prison officials met their burden of proving the availability of administrative remedies." *Kaba,* 458 F.3d at 686.  It was undisputed that Kaba was beaten by prison officials, and the court indicated "[t]he attack itself may have transformed the remedies from available to unavailable for an ordinary prisoner in Kaba's shoes.  The fact that he was able to file his FTCA claim and this lawsuit does not prove that remedies were available within the system." *Id.*

*Kaba* indicates that when doubt exists as to whether or not prison officials acted in a manner that impeded the prisoner's ability to file grievances, the court should not decide the case based on conflicting facts at the summary judgment stage.

**D.      Burden of Proof**

A defendant may use a plaintiff's failure to exhaust administrative remedies as an affirmative defense; however, exhaustion is not a jurisdictional requirement, and inmates need not plead exhaustion or bear the burden of proving exhaustion. *Jones v. Bock,* 549 U.S. 199 (2007); *see also Anderson v. XYZ Correctional Health Servs., Inc.,* 407 F.3d 674, 681 (4th Cir. 2005).  If failure to exhaust is raised as an affirmative defense, the plaintiff may "directly disput[e] the defendant's allegations, [ . . . ]demonstrate the [administrative remedy process] described by the defendant does not actually exist at the prison[,] or provide an excuse for the unexhausted claim. *See* Gary Proctor,

44

*Ngo Excuses: Proving, Rebutting, and Excusing Failure to Exhaust Administrative Remedies in Prisoner Suits after Woodford v. Ngo and Jones v. Bock,* 31 Hamline L.Rev.471, 487-489 (2008). In the event that the plaintiff rebuts the defendant's evidence, the evidence must be weighed equally, and the inmate's testimony may not be discredited as "self-serving." *See Kaba v. Stepp,* 458 F.3d 678, 681 (7th Cir. 2006).

## VII. Analysis

**Plaintiff Hill failed to exhaust the administrative remedy process, and BOP staff members did not prevent Hill from exhausting the administrative remedy process in relation to the incidents claimed in Claim 1, Claim 2, and Claim 3-1:9 of Hill's instant action.**

 Hill's asserts he properly exhausted subclaims 1-1, 1-2, 1-3, and 2-1.  Hill does not allege that he exhausted subclaim 2-2.  In addition, Hill filed many of the subclaims of claim 3 in a BP9 that was filed on December 6, 2006.  *See* DE 77-2.

Notwithstanding the subsequent analysis, Hill did not allow enough time for the BOP to respond his grievances listed in the December 6, 2006 BP9 before filing the complaint in the instant action.  A inmate must exhaust all available administrative remedies before binging an action in federal court.  *See* § 1997e(a).

Despite Hill's allegations that he filed the requisite BP10s and BP11s for several of his claims, this is unsupported by the evidence.  During the third day of the evidentiary hearing, Marvella Heard, a BOP Legal Assistant, indicated that if Hill's BP10 had been received by the Mid-Atlantic Regional Office, then that BP10 would permanently exist in BOP records.[11]  [Tr. Vol. 3,

---

[11]  BOP records are stored on a computerized record keeping system named SENTRY. According to Ms. Heard's testimony, when a BP10 is filed at the Regional Office, an electronic record of that filing is entered in SENTRY and becomes a permanent part of BOP records.  *See* Tr. Vol. 3, p. 119-122.  Furthermore, a BP10 or BP11 rejection notice cannot be issued unless a

p. 119-122].   Heard testified the plaintiff did not file a BP10 at the Regional Level between September 2006 and January 2007.  *Id.  See also* Defendants' Exhibit 1.  Upon further review of the record, there is no BOP record indicating Hill filed a BP10 or BP11 between September 2006 and January 2007, the relevant period of his incarceration at USP Hazelton.  *See* Defendants' Exhibits 1, 2.

This evidence contradicts Hill's allegations and testimony concerning his exhaustion of the administrative remedy process.  This lack of administrative appeals in BOP records is supported by Hill's own statement that he did not attempt to file BP10s and BP11s because he did not have the relevant BP8s and BP9s to attach to the BP10s and BP11s and therefor took the position that he did not have to exhaust  the administrative remedy process.[12]

---

BP10 or BP11 is actually received by the Regional Office or Office of General Counsel, respectively.

[12]        THE COURT: All right, now the second series of questions, if the BP8s and 9s, whether they're [Warden] Haynes or [Warden] Driver, were not responded to, is it your contention and your testimony that excuses you from having to file a timely BP 10 or 11?
        THE WITNESS [Hill]: My position–
        THE COURT: That's a simple question.
        THE WITNESS: It is really not a simple question, Your Honor, and I think we know that it's  not a simple question, is because my position is that when they don't respond to the informal resolution, the process is waived.  However – however, I will take the next step of filing that BP9.  Why?  Because it's *easily accessible*, and that's the only reasons I do it, because it's an *easily accessible* form.  The BP9 I can get from someone else.  I just can't get someone else to process it, so I'll do the BP9 as the next step.
        THE COURT: What about the [BP] 10 and 11?
        THE WITNESS: It depends on what the issue is.  *If the issue is retaliation, then I'm not going to do the 10 and 11.*  For example, with the Lieutenant Trait (sic) situation, I know in my mind – and I wrote a letter to Warden Driver, but I know in my mind that I

There is no evidence that independently supports Hill's assertion that Hazelton officials improperly disposed of his administrative grievances.  Even if Hazelton officials did improperly dispose of his grievances, this would only affect the BP8 and BP9 level of the administrative remedy process.   This theoretical disposal would not exempt Hill from the remaining levels of the administrative remedy process.  Hill's assertion that institutional officials at Hazelton disposed of his grievances is pure argument and speculation devoid of any factual basis.  Moreover, the absence of BP8s and BP9s lends itself to the equal and opposite argument and conclusion that Hill failed to file the administrative remedy forms.  To the contrary Titchenell's credible testimony backed by the affidavit of Susie Elza was that she had the ability to accept or reject a BP9 without an attached BP8 and would seek more information before exercising her discretion; that inmates were not denied the opportunity to file a BP9 by virtue of rejection, denial or lack or response to their BP8; and,  that she did not lose any administrative remedies submitted to her.  Tr. Vol. 3, p. 7, 79-80, 81 and Tr. Vol. 3, p. 92-93.

Hill testified  that he was unable to file BP8s and BP9s because his counselor, Marrero, would not give him forms and was not making rounds in the SHU.  The evidence of record strongly establishes just the opposite.  First, Milton, Garcia, and Stephens-Clements each testified to providing BP8 and BP9 forms to inmates in and out of the SHU even if the inmates were not assigned to their unit.  Tr. Vol. 3, p. 127-127 and 158-159.  Hill testified he obtained BP8 forms from his unit counselor, Marrero.  Tr. Vol.2, p. 117, Tr. Vol. 1, p. 8-9, Tr. Vol. 1, p. 21, Tr. Vol. 1, p. 24-25, Tr. Vol. 1, p. 27-28, Tr. Vol. 1, p. 30, Tr. Vol. 2, p. 135-138, Tr. Vol. 1, p. 49-50, Tr. Vol.

_____

more likely did not do the 10 and 11.  Tr. Vol. 2, p. 147-148 (emphasis added). [DE 148].

1, p. 80, Tr. Vol. 1, p. 55, 56, 58, 59, 61, and Tr. Vol. 1, p. 109-110.  Marrero testified he made regular rounds during the relevant time period and denied he ever deliberately withheld forms from any prisoner or inmate.  Tr. Vo. 2, p. 244.  The undersigned finds Marrero's testimony credible.

While Marrero's testimony showed a lack of knowledge of the procedural requirements imposed by both Supplements in place under Wardens Haynes and Driver, Hill's testimony showed he had intimate knowledge of those supplements and now attempts to use Marrero's lack of understanding as proof that Marrero violated them to the detriment of Hill.   However, it is Hill who the evidence shows was manipulating the procedural rules.  For example, there is strong evidence that Hill created false documents which he introduced in evidence as Plaintiff's Ex. 7, 8, 9, 10, 11, and 12 in order to create the illusion that he attempted to file administrative remedies. Tr. Vol. 3, p. 156-157.  Stephens-Clements denied any recollection of making copies of BP9s for Hill and had she done so she would have copied the front sheet not one of the other 3 carbon copies.  *Id.*

Hill testified he was prevented from buying stamps to use in filing his administrative remedies because his account was frozen.  However, the evidence of his accounts shows this testimony to be false in that Hill had funds that were not frozen and used those funds for other than buying stamps during the relevant time period.  Tr. Vol. 2, p. 248-250.

During his testimony Hill repeatedly took inconsistent positions.  He testified that his inability to get forms from counselor Marrero and Marrero's failure to come to the SHU prevented him from filing BP8s and BP9s.  Yet he later testified he filed BP8s and BP9s which he claims were not responded to.  His statement: "I just know that when I don't receive responses immediately, what I do is simply write the next level."    [Tr. Vol. 1, p.  55-56] clearly shows his active use of the system.

48

Based on: (1) BOP's documentation establishing Hill did not file BP10s or BP11s concerning the claims alleged in the instant action, (2)  the fact that Hill was transferred around the country pursuing his own litigious goals at the time these alleged grievances should have been filed, (3) no evidence suggests these transfers were part of a BOP conspiracy to frustrate Hill's ability to file administrative grievances, and (4)  Hill's acknowledgment that he had *easy access* to administrative remedy forms and chose to not file them due to the futility of his efforts and his interpretation of when retaliation waives the exhaustion requirement; the undersigned finds  that Hill did not exhaust his available administrative remedies, and BOP staff did not frustrate his ability to exhaust available administrative remedies.   The undersigned finds that Hill's failure to exhaust administrative remedies is his own fault and resulted either  from his own faulty interpretation of the law or failed attempts to manipulate the process which was made available to him.  "Prisoner does not exhaust all available remedies, as required to bring suit in federal court challenging prison conditions, simply by failing to follow the required steps so that remedies that once were available to him no longer are. ..."  *Moore v. Bennette,* 517 F.3d 717 (4th Cir. 2008).

Even if Hill's efforts to file BP8s and BP9s at Hazelton were thwarted by BOP officials, this does not excuse him from filing BP10s and BP11s with BOP officials outside of the institution. Although these grievances would have likely been denied for failing to attach the relevant BP8s and BP9s, exhaustion is required even when the relief sought is not available; therefore, futility is not a legal excuse for failing to exhaust the administrative remedy process.  "To be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable rules, so that prison officials have been given an opportunity to address the claims administratively; having done that, a prisoner has exhausted his available remedies, even if prison

employees do not respond." *Id. See also Booth supra* at 741.

**B.**     **Based on the evidence taken at the evidentiary hearing in front of the undersigned, Hill fails to satisfy his burden of proof to validate Claim 3-10 as a proper retaliation claim; therefore, Hill's claim in 3-10 is dismissed as there is no excuse for Hill failing to exhaust the administrative remedy process.**

Hill testified to a number of acts of alleged retaliation.  First, on his arrival at USP Hazelton, Hill asserts he was thrown into the bucket [SHU] because he liked to file suits.  The record reflects he was put into the SHU because he asked for protection, lied about his girlfriend being his attorney, and refused to obey a order of any staff member.  Def. Ex. 3 and Tr. Vol. 2, p. 115-117.  The undersigned finds no credibility with respect to this claim of retaliation.  Moreover, even if true, with respect to the central issue before the court: did retaliation affect his ability to use the administrative remedy process?, the answer is clearly: "No."  Hill testified that even though he considered being thrown in the SHU as retaliation, that did not "stop him from filing and proceeding through with the remedy process."  Tr. Vol. 2, p. 111.

Second, when Hill allegedly complained about C.O. Morgan, he claims Lt. Clements took his CFR, handcuffed him and sent him to the SHU in September 2007 in retaliation.  Hill testified his book was never returned.  To the contrary David Young, Executive Assistant to the Warden, testified he personally returned the CFR to Hill on March 29, 2007.  Plaintiff's Ex. 5, Tr. Vol. 1, p. 37-38 and Tr. Vol. 2, p. 98-99.  Again, the alleged retaliation did not prevent Hill from filing a BP8, BP9 and BP10. Tr. Vol. 1, p. 30.  Even if he did file such remedies, he did not file a BP11 with respect to the claim.  *Id.*

Next, according to Hill, on December 13, 2006, Lt. Trait ransacked Hill's cell and confiscated legal materials.  Tr. Vol. 2, p. 156, 157.  In addition, in what appears to be a separate

50

incident on the same day, Hill alleges that Trait offered "extra trays" to the first inmate to stab Hill. *Id.* at 158, 159.   In his testimony Hill indicates he "wrote to the warden immediately when it happened[.]" *Id.* at 159.   Further, Hill contends that this incident was an act of retaliation; therefore, Hill contends that the exhaustion process was waived for this claim.  *Id.* at 160.   Hill maintains that on December 15, 2006, he "decided to simply go to court [because] these threats needed to be addressed now rather than later[.] [. . .] [He] was simply past waiting around for something to happen to [him] and had decided to go to court instead[,] and [he] was fearful of filing any further [grievances against] Lt. Trait (sic)."   *Id.* at 92, 93.   Although Hill contends he feared filing further grievances against Lt. Trait, Hill maintains that he filed a BP 8 on the incident after he was able to obtain a BP8 form.  *Id.* at 159.   Hill alleges that this BP8 was filed after he filed the complaint of the instant action.   *Id.*

In the event that Hill filed a BP8 on this claim, the claim fails along with his other claims because it was not properly exhausted through the entire administrative remedy process.   However, *in arguendo*, if Hill actually did not file administrative grievances concerning this incident based on his fear of retaliatory measures, Hill's claim still fails.

The evidence taken at the evidentiary hearing directly contradicts Hill's assertions.   Further, Hill's allegations are the only part of the record which describe the "extra trays" incident.   Hill has some corroborating testimony from two other SHU inmates, Palmer and Bland, that Lt. Trait confiscated some of Hill's legal material and was aggressive; however, these witnesses did not testify in corroboration that Trait offered "extra trays" to the first inmate to stab Hill.   *See* Tr. Vol. 2, p. 62-71 and 2:22-44.   In addition, Lt. Spotlan and Lt. Trait deny Hill's allegations in their respective declarations concerning the claims within the instant action.   *See* Government Exhibits 4,11. [DE

77-7 and 77-14].

The issue of whether there was retaliation as a matter of fact was litigated in front of the undersigned, and based on all the evidence, taken in the light favorable to Hill, the undersigned **FINDS** by a preponderance of the evidence that no rational jury could find that such a threat was made. Further, Hill fails to provide sufficient excuse for failing to file the requisite administrative remedies. Thus, Claim 3-10 of the instant action must fail.

### VII. Recommendation

Based on the foregoing, and pursuant to the opinion and mandate of the Fourth Circuit Court of Appeals, the undersigned **FINDS** Hill failed to exhaust administrative remedies which were available to him; Hill was not prevented from exhausting administrative remedies by the BOP; and therefore, the undersigned **RECOMMENDS** defendants' Motion to Dismiss or for Summary Judgment [DE 77] be **GRANTED** and **RECOMMENDS** that all claims of the instant action be **DISMISSED**. Any party may file, within fourteen (14) days after being served with a copy of this Recommendation, with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh , United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins,* 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the

docket sheet.  The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

Dated: September 5, 2012

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE